UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>(1) JOSEPH PONZO and<br>(2) CHRISTOPHER PONZO,<br><br>Defendants | Criminal No. 22cr10094<br><br>Violations:<br><br>Count One: Conspiracy to Commit Wire Fraud<br>(18 U.S.C. § 1349)<br><br>Counts Two - Thirteen: Wire Fraud and Honest Services Wire Fraud; Aiding and Abetting<br>(18 U.S.C. §§ 1343, 1346, and 2)<br><br>Forfeiture Allegation:<br>(18 U.S.C. § 981(a)(1)(C) and<br>28 U.S.C. § 2461) |

## INDICTMENT

At all times relevant to this Indictment:

### General Allegations

1. JOSEPH PONZO was a resident of Stoneham, MA. JOSEPH PONZO was also a fulltime Stoneham Police Officer, earning total wages of approximately $145,416, $103,762, $126,487, $131,672, and $128,965 in years 2015, 2016, 2017, 2018, and 2019, respectively.

   a. JOSEPH PONZO was also a principal of Air Tight Solutions, LLC ("AIR TIGHT"), a MA company formed in December 2014 that was involved in the "business of the application of insulation products," according to its incorporation documents.

   b. AIR TIGHT's business address was JOSEPH PONZO's residence. AIR TIGHT's sole manager and employee was JOSEPH PONZO's spouse, a fulltime homemaker. JOSEPH PONZO's name was not on any AIR TIGHT incorporation documents, and JOSEPH PONZO did not have a MA license to perform home improvement contracting work. Neither JOSEPH PONZO nor his spouse had any prior business experience in performing energy efficiency

1

insulation work.

c. From 2015 to 2019, AIR TIGHT reported the following gross income[1] (appx):

| 2015 | 2016 | 2017 | 2018 | 2019 | Total |
|---|---|---|---|---|---|
| $493,741 | $1,526,625 | $1,391,753 | $2,843,325 | $1,394,881 | **$7,650,325** |

2. CHRISTOPHER PONZO was a resident of North Reading, MA ("CHRIS PONZO") and JOSEPH PONZO's brother. CHRIS PONZO was the owner of CAP Electric Inc. (and its predecessor company, Electrical Associates, LLC (referred collectively herein as "CAP Electric")). CAP Electric was a Massachusetts-based electrical contracting company that performed energy efficiency work, among other things. From 2013 to 2017, CAP Electric received approximately $29,212,272 in payments from Company A (defined below).

3. A resident of Massachusetts (the "Spouse") was married to JOSEPH PONZO.

4. A resident of Massachusetts (the "Associate") was an associate of CHRIS PONZO and JOSEPH PONZO. The Associate was employed as a project manager at "Company A,"[2] which was the Massachusetts branch office of a national energy efficiency consulting company whose headquarters were based in Texas (the "Parent Company").

5. AIR TIGHT, CAP Electric, and Company A (i) each did business in and affecting interstate commerce; and (ii) each maintained bank accounts at financial institutions that processed check deposit and check payment transactions via interstate wire communications.

---

[1] AIR TIGHT's income came from one source, Company A (as defined below), with the exception of one payment from CAP Electric (also defined below) and one payment from the Town of Stoneham for $168.
[2] As defined herein, Company A includes its predecessor company in MA (which the Parent Company acquired in or about 2015) and Company A.

2

*The Mass Save Program and Company A*

6.      The Commonwealth of Massachusetts requires all consumers to pay an energy efficiency surcharge, which is included in, for example, every homeowner's monthly electric bill. *See* M.G.L., Ch. 25, § 19. Electric and natural gas distribution companies (*e.g.,* National Grid, Eversource) are required to collect these surcharges – which amount to hundreds of millions of dollars each year – and use these energy efficiency funds ("EE Funds") to fund energy efficiency programs and initiatives in Massachusetts.

7.      Mass Save is a public/private partnership in Massachusetts in which sponsors of the Mass Save program (gas and electric utility companies, including National Grid and Eversource) use the EE Funds to fund energy conservation projects and improvements for consumers. EE funds are often distributed under the Mass Save program through lead vendors. Utility companies select lead vendors who (i) obtain contracts with consumers; and (ii) select and oversee contractors to perform the energy conservation and improvement work for consumers, among other things. The utility companies then disbursed EE Funds to the lead vendor to pay the contractor for the work performed. The utility companies compensated the lead vendor an administration fee for performing its role.

8.      Depending on the nature of the project, the lead vendor would use EE Funds to pay the contractor a percentage of the invoice (*e.g.*, commercial properties, where EE Funds are used to pay one-half of the invoice, with the consumer to pay the other half); or the lead vendor would use EE Funds to pay the costs of the entire project (*e.g.*, residential properties, where EE Funds are used to pay the contractor's total invoice, with the consumer paying nothing).

3

9.  Company A was a lead vendor under the Mass Save program. The Associate was a project manager within Company A's residential conservation services division ("RCSD"), and participated in the recommendation, selection, and oversight of contractors that performed Mass Save energy improvement contracts with multi-family residential consumers. As a Company A employee, the Associate was prohibited from accepting anything of value from contractors. Likewise, Company A's policies prohibited contractors from giving anything of value to Company A employees.

Overview of the Conspiracy and the Scheme to Defraud

10.  From at least as early as 2013 continuing through 2017, in the District of Massachusetts and elsewhere, the defendants, JOSEPH PONZO and CHRIS PONZO, together with others known and unknown, agreed to defraud Company A of its right to the honest and faithful services of the Associate, through paying bribes and kickbacks to the Associate, specifically, a stream of benefits that included hundreds of thousands of dollars in cash and other in-kind benefits, that were paid to, or on behalf of, the Associate in exchange for the Associate's assistance to JOSEPH PONZO and CHRIS PONZO in obtaining Mass Save contracts and receiving Company A payments through Company A's RCSD, among other things.

Object and Purpose of the Conspiracy and Scheme to Defraud

11.  The object of the conspiracy and scheme to defraud was for JOSEPH PONZO and CHRIS PONZO to pay bribes and kickbacks to the Associate in exchange for the Associate's assistance to JOSEPH PONZO and CHRIS PONZO in obtaining Mass Save contracts and receiving Company A payments through Company A's RCSD. The principal purpose of the

conspiracy and the scheme to defraud was for JOSEPH PONZO and CHRIS PONZO to make money and personally enrich themselves from the lucrative Mass Save contracts and Company A payments that they obtained through Company A's RCSD.

Manner and Means of the Conspiracy and Scheme to Defraud

12.   Among the manner and means by which JOSEPH PONZO, CHRIS PONZO, and coconspirators known and unknown to the Grand Jury carried out the conspiracy and the scheme to defraud were the following:

   a.   Beginning at least as early as 2013 and continuing through 2017, CHRIS PONZO paid the Associate approximately $1,000 in cash bribes every week in exchange for the Associate's assistance at Company A with respect to CAP Electric. The Associate's assistance included, among other things, (i) assistance in having Company A select CAP Electric as an approved contractor for Mass Save projects; (ii) assisting CAP Electric in obtaining Company A (RCSD) Mass Save projects; and (iii) assisting CAP Electric with billing, invoicing, and receiving payment from Company A for completed projects.

   b.   Beginning at least as early as late 2014, CHRIS PONZO and the Associate assisted JOSEPH PONZO in creating a company, AIR TIGHT, for the purpose of obtaining Company A (RCSD) Mass Save projects that involved residential insulation work. JOSEPH PONZO, CHRIS PONZO, and the Associate were aware that JOSEPH PONZO had no prior business

5

        experience in performing energy efficiency insulation work.

c.     In order to conceal JOSEPH PONZO's involvement in AIR TIGHT from being disclosed in publicly available documents, JOSEPH PONZO and his coconspirators (i) incorporated AIR TIGHT under the Spouse's name, with the Spouse as the sole manager of AIR TIGHT; (ii) registered the Spouse as a Massachusetts Home Improvement Contractor; and (iii) obtained Building Performance Institute, Inc. certification for the Spouse. JOSEPH PONZO, CHRIS PONZO, and the Associate were aware that the Spouse had no prior business experience in performing energy efficiency insulation work, and that the Spouse would not be performing any insulation work for AIR TIGHT.

d.     From 2015 through 2017, JOSEPH PONZO and CHRIS PONZO paid the Associate thousands of dollars in extra cash payments (at times approximately $5,000 and $10,000 in cash) – money that was in addition to the Associate's weekly $1,000 cash payment – in exchange for the Associate's assistance at Company A with respect to AIR TIGHT. The Associate's assistance included, among other things, (i) assisting AIR TIGHT in becoming an approved contractor for Company A for Mass Save projects; (ii) assisting AIR TIGHT in obtaining Company A (RCSD) Mass Save projects; and (iii) assisting AIR TIGHT with billing, invoicing, and receiving payment from Company A for completed projects. The

        Associate prepared nearly all of AIR TIGHT's invoices to Company A from 2015 through 2017.

e. After AIR TIGHT obtained Company A Mass Save projects, JOSEPH PONZO would subcontract the insulation work to an outside contractor, with the Spouse performing none of the work on behalf of AIR TIGHT. Although JOSEPH PONZO performed little to no work, AIR TIGHT received approximately $3.4 million in payments from Company A from approximately 2015 to 2017, while reporting only approximately $766,179 in contract labor costs during that period. In or about June 2018, JOSEPH PONZO used AIR TIGHT proceeds to acquire a vacation home in Marco Island, Florida, valued at approximately $830,000.

f. To hide the bribery-kickback scheme, JOSEPH PONZO, CHRIS PONZO, and the Associate took various measures to conceal their illicit activities, which included the following:

    i. At or around the time Company A paid AIR TIGHT for Mass Save work, JOSEPH PONZO would disguise his share of Associate bribe/kickback payments to the Associate as AIR TIGHT business expenses payable to CAP Electric.

    ii. To fund cash bribe-kickback payments to the Associate, CHRIS PONZO would cash Company A and other CAP Electric customer checks that were payable to CAP Electric. For example, from November 2015 to

      December 2016, CHRIS PONZO cashed approximately $371,339 in checks payable to CAP Electric at a Revere check cashing business, while incurring approximately $9,283 in check cashing fees.

iii. CHRIS PONZO would pay his share and JOSEPH PONZO's share of the cash bribe-kickback payments to the Associate by meeting with the Associate at job sites in Massachusetts and paying the Associate cash inside CHRIS PONZO's truck. On certain occasions, CHRIS PONZO paid the Associate larger sums of cash (at times approximately $5,000 and $10,000 in cash), and CHRIS PONZO would tell the Associate that the extra cash was from JOSEPH PONZO.

iv. JOSEPH PONZO and CHRIS PONZO would also purchase gift cards and fuel cards and give them to the Associate as part of the ongoing bribery-kickback scheme.

v. CHRIS PONZO made other purchases on the Associate's behalf as part of the bribery-kickback scheme, including but not limited to: (1) purchasing a new Apple Macbook for the Associate (May 2013); (2) purchasing a John Deere utility tractor, with a backhoe and loader costing approximately $25,875 (November 2013); (3) paying for approximately $3,766 in bathroom fixtures for the Associate's home (May 2014); (4) performing electrical work at the Associate's home costing thousands of dollars (July 2014); and (5) purchasing outdoor lighting fixtures for the

8

    Associate's home costing over $440 (June 2015).

 g. After the Associate left Company A in mid-to-late June 2017, CHRIS PONZO continued to pay the Associate $1,000 per week via check payments from late June 2017 through in or about July 2019, and the Associate continued to provide assistance to CHRIS PONZO and JOSEPH PONZO with CAP Electric and AIR TIGHT invoices and billing matters with Company A.

<u>Acts in Furtherance of the Conspiracy and the Scheme to Defraud</u>

13. On or about various dates between approximately March 2013 and July 2017, in the District of Massachusetts and elsewhere, the conspirators committed, caused to be committed, and aided and abetted the commission of the following acts, among others, as part of the conspiracy and the scheme to defraud:

 a. On or about March 6, 2013, the Associate helped prepare CAP Electric's invoice to Company A, which consisted of approximately $73,698 in electrical and lighting supplies.

 b. On or about March 27, 2013, after the Associate helped prepare another CAP Electric invoice to Company A, CHRIS PONZO emailed the Associate that CHRIS PONZO would "put [the Associate] in for overtime.."

 c. On or about May 24, 2013, the Associate emailed CHRIS PONZO that the Associate "need[ed] a new macbook."

d. On or about November 22, 2013, the Associate emailed CHRIS PONZO a quote for a John Deere utility tractor with a backhoe and loader costing approximately $25,875, with the message "Here is the tractor you were looking for."

e. On or about January 23, 2014, CHRIS PONZO emailed JOSEPH PONZO, informing JOSEPH PONZO that CHRIS PONZO was "giv[ing] out thousands of dollars in gift cards all year round to keep us working and to keep the checks coming in .. so we all make $$$..." and that CHRIS PONZO was "Paying [the Associate] every week."

f. On or about March 10, 2014, CHRIS PONZO emailed the Associate: "It looks like they have around 15 possible properties maybe we can get??? All our hard work is paying off []!!!"

g. On or about May 13, 2014, the Associate emailed CHRIS PONZO a bill for bathroom fixtures costs for the Associate's home totaling approximately $3,766.

h. On or about October 20, 2014, CHRIS PONZO emailed the Associate: "I need some contracts []!!!"

i. On or about December 11, 2014, JOSEPH PONZO emailed the Associate the limited liability company agreement for AIR TIGHT.

j. On or about December 11, 2014, JOSEPH PONZO emailed the Associate the Spouse's email address as the contact email for AIR TIGHT.

10

k. On or about January 10, 2015, the Associate emailed JOSEPH PONZO advice on what licenses the Spouse needed to have for AIR TIGHT.

l. On or about February 16, 2015, the Associate emailed JOSEPH PONZO and CHRIS PONZO to inform them that Company A had approved AIR TIGHT and CAP Electric as contractors for 2015, stating: "Congratulations your both '[legitimate]' [Company A] contractors. I use that term loosely."

m. On or about March 28, 2015, the Associate emailed JOSEPH PONZO regarding an AIR TIGHT job: "Your weekend project is to come up with an invoice to send me. You need your company name, address, phone number and an invoice number. Job Name: [ ] Address: [ ] 1064 hours of air sealing at 75.25/hr = $80,066.00."

n. On or about March 30, 2015, JOSEPH PONZO emailed the Associate and CHRIS PONZO, asking the Associate to prepare the AIR TIGHT invoice using a template that the Associate had provided, stating: "If you don't mind doing it on that pdf than I don't mind!!"

o. On or about March 30, 2015, the Associate emailed JOSEPH PONZO and CHRIS PONZO, agreeing to do the AIR TIGHT invoice: "It's just easier for me if I do it. You two are delinquents."

p. On or about March 30, 2015, JOSEPH PONZO emailed the Associate and CHRIS PONZO, agreeing to the arrangement, stating: "We are definitely delinquents!!!! Ill let the pro handle all the invoices!!"

11

q. On or about April 6, 2015, the Associate emailed CHRIS PONZO, informing him that a proposed CAP Electric job had to go through Company A's commercial program instead of the more lucrative RCSD (which paid the contractor's full cost instead of partial costs as in the commercial program).

r. On or about April 6, 2015, CHRIS PONZO responded via email to the Associate, asking the Associate to try to keep the proposed CAP Electric job with Company A's RCSD: "lets play dumb for the lords sake."

s. On or about April 6, 2015, the Associate responded to CHRIS PONZO's request via email, stating: "Sorry homie, I tried.  They've been all over that shit lately."

t. On or about April 28, 2015, the Associate emailed a residential property manager in Massachusetts, copying CHRIS PONZO, in an effort to get Mass Save contracts for CAP Electric and AIR TIGHT, stating: "We are offering new thermostats, DHW devices and air sealing. … The Air Sealing in the attic would significantly help to alleviate ice damns from developing. Something I know they had lots of this past winter.  There is no cost to them for any of the work."

u. On or about April 28, 2015, CHRIS PONZO forwarded the Associate's above email to JOSEPH PONZO, informing JOSEPH PONZO: "[The Associate's] working it."

v. On or about June 24, 2015, CHRIS PONZO emailed a third party vendor to deliver lighting fixtures (that CHRIS PONZO paid for) to the Associate's home.

12

w. On or about August 3, 2015, JOSEPH PONZO told CHRIS PONZO to remind the Associate to do the AIR TIGHT invoice to Company A for a Mass Save job, via email: "Remind [the Associate] to do the billing for Wilmington!!"

x. On or about September 17, 2015, CHRIS PONZO emailed the Associate a list of jobs that AIR TIGHT was scheduled to complete that year for Company A, after the Associate had requested the list from JOSEPH PONZO and CHRIS PONZO.

y. On or about September 17, 2015, the Associate responded by email to the above list of AIR TIGHT jobs: "Thank you Christopher for your fast response. … I presume the co-founder of Air Tight is busy watching Regis and Kelly."

z. On or about September 17, 2015, JOSEPH PONZO responded to the Associate and CHRIS PONZO via email: "Hahaha. I told you [both] I get paid for what I know and with all that knowledge I get sleepy so I just woke up!!!"

aa. On or about October 19, 2015, the Associate emailed CHRISTOPHER PONZO to inform him that (i) the Associate had notified JOSEPH PONZO that AIR TIGHT invoices had been submitted on his behalf; and that (ii) the Associate had, in fact, submitted two invoices to Company A for AIR TIGHT, which included attached AIR TIGHT invoices for $59,297 for an insulation job in Boston, and for $61,404 for an insulation job in Wilmington.

bb. On or about July 11, 2016, the Associate emailed JOSEPH PONZO and CHRIS PONZO a completed AIR TIGHT invoice to Company A for $120,396 for an

13

insulation job in Boston.

cc. On or about the same date, July 11, 2016, the Associate emailed JOSEPH PONZO and CHRIS PONZO a completed AIR TIGHT invoice to Company A for $74,576 for an insulation job in Boston.

dd. On or about the same date, July 11, 2016, the Associate emailed JOSEPH PONZO and CHRIS PONZO a completed AIR TIGHT invoice to Company A for $78,368 for an insulation job in Malden.

ee. On or about September 23, 2016, CHRIS PONZO emailed JOSEPH PONZO, copying the Associate, to inform JOSEPH PONZO that the Associate had already been out to a property in Cambridge in an effort to find a Mass Save job for AIR TIGHT: "Joseph, [the Associate] is way ahead of you [the Associate has] already visited the property. We feel we are basically running your business for you. Have a wonderful night sir."

ff. On or about October 3, 2016, CHRIS PONZO emailed JOSEPH PONZO in an email, titled "commisions," stating: "joe, send me the list of what I owe [the Associate] and what you will owe me. You can pay me, I will just hold onto them for next year.. ty."

gg. On or about October 23, 2016, the Associate emailed JOSEPH PONZO and CHRIS PONZO a completed AIR TIGHT invoice to Company A for $62,006 for an insulation job in Watertown.

hh. On or about November 20, 2016, CHRIS PONZO emailed JOSEPH PONZO

14

regarding the bribe-kickback payments that were owed to the Associate, stating: "you just owe [the Associate] for fall river now? I can't keep up? Ty."

ii. On or about December 5, 2016, the Associate emailed JOSEPH PONZO and CHRIS PONZO a completed AIR TIGHT invoice to Company A for $134,616 for an insulation job in Cambridge.

jj. On or about December 5, 2016, the Associate emailed CHRIS PONZO a completed CAP Electric invoice to Company A for $67,778 for an electric installation job in Cambridge.

kk. On or about June 23, 2017, the Associate emailed JOSEPH PONZO and CHRIS PONZO completed AIR TIGHT invoices to Company A for insulation jobs at Melrose and Andover.

ll. On or about June 28, 2017, CHRIS PONZO emailed JOSEPH PONZO to check if AIR TIGHT invoices had been sent to Company A, stating: "did you bill it out yet."

mm. On or about June 28, 2017 JOSEPH PONZO responded to CHRIS PONZO via email, stating: "A while ago it was short change and I put it in with those three invoices we paid [the Associate] all at once."

nn. On or about June 28, 2017, after CHRIS PONZO acknowledged the above email, JOSEPH PONZO emailed CHRIS PONZO, stating: "I just looked it up we billed it and paid [the Associate] for Northborough, revere and Clinton on May 1."

15

## COUNT ONE
Conspiracy to Commit Wire Fraud Honest Services Wire Fraud
(18 U.S.C. § 1349)

The Grand Jury charges:

14. The Grand Jury re-alleges and incorporates by reference paragraphs 1-13 of this Indictment.

15. From at least as early as 2013 continuing through at least July 2017, in the District of Massachusetts, and elsewhere, the defendants,

(1) JOSEPH PONZO and
(2) CHRISTOPHER PONZO,

conspired with each other and with others known and unknown to the Grand Jury to commit the following offenses: wire fraud and honest services wire fraud, in violation of Title 18, United States Code, Sections 1343 and 1346, specifically, having devised and intending to devise a scheme and artifice to defraud and to obtain money and property, to wit, Company A payments, by means of materially false and fraudulent pretenses, representations and promises, and to defraud and deprive Company A of its right to the honest and faithful services of its employee, the Associate, through bribes and kickbacks, to wit, a stream of benefits to include cash payments and other in-kind benefits that were paid to, and on behalf of, the Associate, to transmit and cause to be transmitted, by means of wire communications in interstate and foreign commerce, writings, signs, signals, pictures and sounds, for the purpose of executing the scheme to defraud.

All in violation of Title 18, United States Code, Section 1349.

16

## COUNTS TWO - THIRTEEN
### Wire Fraud and Honest Services Wire Fraud; Aiding and Abetting
### (18 U.S.C. §§ 1343, 1346, and 2)

The Grand Jury charges:

16.  The Grand Jury re-alleges and incorporates by reference paragraphs 1-13 of this Indictment.

17.  On or about the dates below, in the District of Massachusetts, and elsewhere, the defendants,

(1) JOSEPH PONZO and
(2) CHRISTOPHER PONZO,

having devised and intending to devise a scheme and artifice to defraud and to obtain money and property, specifically, Company A payments, by means of materially false and fraudulent pretenses, representations and promises, and to defraud and deprive Company A of its right to the honest and faithful services of its employee, the Associate, through bribes and kickbacks, specifically, a stream of benefits to include cash payments and other in-kind benefits that were paid to, and on behalf of, the Associate, to transmit and cause to be transmitted, by means of wire communications in interstate and foreign commerce, writings, signs, signals, pictures and sounds, for the purpose of executing the scheme to defraud, as set forth below:

| Count | Check Date/Email date | Appx. Deposit Date | Description |
|---|---|---|---|
| 2 | 4/28/2017 | 5/9/2017 | Company A check for $187,072 deposited to AIR TIGHT bank account |
| 3 | 6/5/2017 | 6/8/2017 | Company A check for $76,178 deposited to AIR TIGHT bank account |
| 4 | 6/6/2017 | 6/8/2017 | Company A check for $130,192 deposited to AIR TIGHT bank account |

17

| Count | Check Date/Email date | Appx. Deposit Date | Description |
|---|---|---|---|
| 5 | 6/26/2017 | 6/30/2017 | Company A check for $167,796 deposited to AIR TIGHT bank account |
| 6 | 5/5/2017 | 5/15/2017 | Company A check for $99,853 deposited to CAP Electric bank account |
| 7 | 5/19/2017 | 6/6/2017 | Company A check for $218,464 deposited to CAP Electric bank account |
| 8 | 5/26/2017 | 6/6/2017 | Company A check for $189,080 deposited to CAP Electric bank account |
| 9 | 6/5/2017 | 6/12/2017 | Company A check for $859,398 deposited to CAP Electric bank account |
| 10 | 6/9/2017 | 6/20/2017 | Company A check for $1,050 deposited to CAP Electric bank account |
| 11 | 6/19/2017 | 6/26/2017 | Company A check for $33,372 deposited to CAP Electric bank account |
| 12 | 6/26/2017 | 7/6/2017 | Company A check for $116,760 deposited to CAP Electric bank account |
| 13 | 6/28/2017 | n/a | JOSEPH PONZO email to CHRIS PONZO, stating: "I just looked it up we billed it and paid [the Associate] for Northborough, revere and Clinton on May 1." (email transmitted via interstate wire communication) |

All in violation of Title 18, United States Code, Sections 1343, 1346 and 2.

## FORFEITURE ALLEGATION
(18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461(c))

The Grand Jury further finds:

18. Upon conviction of one or more of the offenses in violation of Title 18, United States Code, Sections 1343, 1346, 1349, and 2 set forth in Counts One through Thirteen of this Indictment, the defendants,

(1) JOSEPH PONZO and
(2) CHRISTOPHER PONZO,

shall forfeit to the United States, pursuant to Title 18, United States Code, Section 981(a)(1)(C), and Title 28, United States Code, Section 2461(c), any property, real or personal, which constitutes or is derived from proceeds traceable to the offenses.

19. If any of the property described above, as being forfeitable pursuant to Title 18, United States Code, Section 981(a)(1)(C), and Title 28, United States Code, Section 2461(c), as a result of any act or omission of the defendants --

    a. cannot be located upon the exercise of due diligence;

    b. has been transferred or sold to, or deposited with, a third party;

    c. has been placed beyond the jurisdiction of the Court;

    d. has been substantially diminished in value; or

    e. has been commingled with other property which cannot be divided without difficulty;

it is the intention of the United States, pursuant to Title 28, United States Code, Section 2461(c), incorporating Title 21, United States Code, Section 853(p), to seek forfeiture of any other property of the defendant up to the value of the property described above.

All pursuant to Title 18, United States Code, Section 981(a)(1)(C), and Title 28, United States Code, Section 2461(c).

A TRUE BILL

_____
FOREPERSON

_____
DUSTIN CHAO
ELYSA WAN
ASSISTANT UNITED STATES ATTORNEYS
DISTRICT OF MASSACHUSETTS

District of Massachusetts: APRIL 28, 2022
Returned into the District Court by the Grand Jurors and filed.

Dawn M. King 4:50pm
DEPUTY CLERK